Nicole Owens
Executive Director
Mary E. Spears, Indiana Bar No. 27353-49
Jonah J. Horwitz, Idaho Bar No. 10494
Assistant Federal Defenders
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone: (208) 331-5530
Facsimile:  (208) 331-5559
ECF:  Mary_Spears@fd.org
        Jonah_Horwitz@fd.org

Attorneys for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH,**<br>Petitioner,<br><br>v.<br><br>**RANDY VALLEY,**<br>Warden, Idaho Maximum Security Institution,<br>Respondent. | Case No. 1:24-cv-00485-GMS<br><br>**CAPITAL CASE**<br><br>REPLY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS AND APPLICATION FOR STAY OF EXECUTION [DKTS. 1, 10]<br><br>**EXECUTION SCHEDULED FOR NOVEMBER 13, 2024** |

Pursuant to the Court's order, *see* Dkt. 14, Mr. Creech files this reply in support of his habeas petition and his application for a stay of execution. He will begin with the petition and then turn to the stay. Every part of this reply is incorporated into every other part.

## I.    Reply in Support of Petition for Writ of Habeas Corpus.[1]

With respect to the petition itself, the State is incorrect to challenge the claims as procedurally defaulted and incorrect to discount the Eighth Amendment theory on the merits.

### A.    Any procedural default would be inadequate to bar review.

As an initial matter, the State's procedural-default defense is misplaced. The State's sole default theory is that Mr. Creech's claim is not cognizable under Idaho's post-conviction statutes. *See* Dkt. 16 at 8–9. There are multiple reasons why the State's stratagem fails.

The first fatal flaw in the State's approach is that it has never—as the Attorney General admits—been adopted by the Idaho Supreme Court. *See id.* at 9 ("The state certainly recognizes there are no Idaho cases directly supporting its argument.").[2] Procedural defaults do not bar federal habeas review unless they are "firmly established and regularly followed." *Johnson v. Lee*, 578 U.S. 605, 606 (2016). By the State's own admission, its view of cognizability has not been "regularly followed." In fact, it has *never* been followed. That is sufficient to preclude reliance upon it here. *See Valerio v. Crawford*, 306 F.3d 742, 776 (9th Cir. 2002)

---

[1] As Respondent has done, *see* Dkt. 16, Mr. Creech is submitting one consolidated pleading both replying to Respondent's Answer (Part I) and replying in support of his Application for Stay of Execution (Part II). District of Idaho local rules impose a 50-page limit on reply briefs on the merits and on default, Dist. Idaho Loc. Civ. R. 9.2(g)(3)(B), to which Part I adheres. The Reply in Support of Stay, by contrast, adheres to Local Rule 7.1(b)(3)'s 10-page limit for replies to motions.

[2] Unless otherwise noted, all internal quotation marks and citations are omitted and all emphasis is added.

(declining to enforce a default where it was not "clear, consistently applied, and well-established at the time of petitioner's purported default").

To get around its dearth of caselaw, the State falls back on the language of Idaho's post-conviction statutes. *See* Dkt. 16 at 9. In the State's opinion, that language is "sufficiently clear as to put a petitioner on notice that he cannot raise the claims Creech has asserted." *Id.* The State's position is completely irreconcilable with how parallel provisions have been construed by courts around the country. If anything, the state of the law would have put a petitioner on notice that Mr. Creech's claim *was* cognizable in post-conviction.

The key language is in Idaho Code § 19-4901(a)(1).[3] That provision permits an inmate to raise a claim where "the conviction or the sentence was in violation of the constitution of the United States or the constitution or laws of this state." In a single sentence of argument devoid of citation, the State contends that the provision does not provide a vehicle for Mr. Creech's claim "because Creech is not challenging his underlying sentence but is challenging the fact of his execution by any method." Dkt. 16 at 9. As an initial matter, the State's presentation is so meager as to effectively constitute a forfeiture. The State has the burden of proving the adequacy

---

[3] Section 19-4901 is part of the Uniform Post-Conviction Procedure Act (UPCPA). "Generally," the UPCPA "applies to post-conviction proceedings." *Dunlap v. State*, 106 P.3d 376, 382 (Idaho 2004). Idaho Code § 19-2719 is a special post-conviction statute that governs capital cases. The statute "supersedes the UPCPA" in capital cases "to the extent that their provisions conflict." *McKinney v. State*, 992 P.2d 144, 149 (Idaho 1999). Below, Mr. Creech will address the impact of § 19-2719 on the procedural-default issue. Because neither statute provides an adequate bar, it is unnecessary to consider whether they conflict.

of its asserted default. *See Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003).
One line that fails to engage whatsoever with the substantial body of law on the
subject falls short of discharging the burden.

If the Court's analysis proceeds further, the result remains the same. Section
19-4901 follows the general structure of post-conviction statutes in the state and
federal systems. *See, e.g.*, Alaska Stat. § 12.72.010(1) (allowing for post-conviction
relief where "the conviction or the sentence was in violation of the Constitution of
the United States or the constitution or laws of this state"); S.C. Code Ann. § 17-27-
20(a)(1) (same); R.I. Gen. Law § 10-9.1-1(a)(1) (same); Ind. Post-Conviction R.
1.1(a)(1) (same). The common understanding of these provisions is precisely the
same as Mr. Creech's. Specifically, when an execution would be unlawful under any
method, it means that the death sentence is unconstitutional, and the individual
therefore has a cognizable claim under the post-conviction statute.

That is unquestionably true of federal law. The federal analog to Idaho's post-
conviction statute is 28 U.S.C. § 2254(a). That clause authorizes a petitioner to
initiate an action "only on the ground that he is in custody in violation of the
Constitution or laws or treaties of the United States." Contrary to the State's
interpretation of Idaho's statute, the federal law has been read to mean that a
habeas petition is the appropriate vehicle for attacking a proposed execution when
the theory implies the unconstitutionality of any possible method. *See Nelson v.
Campbell*, 541 U.S. 637, 647 (2004) (clarifying that a claim is appropriate for federal
habeas, as opposed to a civil rights action under 42 U.S.C. § 1983, if a grant of relief

would "*necessarily* prevent [the State] from carrying out the execution); *Adams v. Bradshaw*, 644 F.3d 481, 482–83 (6th Cir. 2011) (applying the *Nelson* framework and concluding that a challenge to an execution sounds in habeas where it would, if it prevailed, "render [the] death sentence effectively invalid"). That is the nature of Mr. Creech's claim. He alleged in state court that it "would constitute an unnecessary and wanton infliction of pain on Mr. Creech to attempt to execute him *by any method* after subjecting him to the psychological torment of the botched execution." Dkt. 6, Lodging A-1[4] at 18. His claim therefore falls in the post-conviction column.

State courts have consistently taken the same approach. For example, it is routine that inmates challenging their competence to be executed will raise their claims under state post-conviction regimes. *See, e.g.*, *State ex rel. Clayton v. Griffith*, 457 S.W.3d 735 (Mo. 2015) (en banc); *Green v. State*, 374 S.W.3d 434 (Tex. Ct. Crim. App. 2012). Often they do so under post-conviction statutes that have the analog provisions to Idaho Code § 19-4901(a)(1). *See, e.g.*, *Overstreet v. State*, 993 N.E.2d 179 (Ind. 2013). Competency claims typically have no connection to the events occurring in the original criminal proceedings. Often, they involve cognitive deficits that arose years after trial. *See, e.g.*, *Madison v. Alabama*, 586 U.S. 265, 267–68 (2019) (holding that dementia can sustain a competency claim). A competence claim thus follows the same timeline as Mr. Creech's. When a petitioner raises competence, the constitutional theory is that "the Eighth Amendment prohibits a

---

[4] Hereinafter, all citations to the Dkt. 6 lodgings will omit the docket entry.

State from *carrying out* a sentence of death upon a prisoner who is insane." *Ford v. Wainwright*, 477 U.S. 399, 409–10 (1986). As such, it is based not on "[p]rior findings of competency" but on the person's "present mental condition" at the time he is facing execution. *Panetti v. Quarterman*, 551 U.S. 930, 934 (2007). Competence-to-be executed is thus an appropriate post-conviction matter in the same way that Mr. Creech's claim is. As in the competence context, his claim is that it would be unconstitutional to carry out his execution by any method. *See Nance v. Ward*, 597 U.S. 159, 170 (2022) (reiterating that a claim is suited for habeas when "the requested relief would necessarily invalidate, or *foreclose the State from implementing,* the death sentence").

The State has not identified any Idaho cases that depart from the consensus just described. Consequently, the fictional inmate who is aware of the general state of the law would, in Idaho as anywhere else, assume that he was permitted to use the post-conviction statute to allege that an execution by any method would be unconstitutional. It follows that the State's default is inadequate.

Instead of engaging with the precedent, the State invokes the proposition that a default remains adequate even when "there is no reported case directly on point." Dkt. 16 at 7 (quoting *Bargas v. Burns*, 179 F.3d 1207, 1212 (9th Cir. 1999)). *Bargas* is far afield. There, the state rule at issue was Nevada authority providing that "[a] petitioner must raise all claims in his first habeas petition." 179 F.3d at 1212. The Ninth Circuit inferred from the rule that a petitioner was required "not only to raise all claims in his first petition from the denial of post-conviction relief,

but also to *appeal* from the denial of post-conviction relief." *Id.* (emphasis in original). It reasoned from the baseline principle that "Nevada case law has set forth a clear and regularly applied rule that a petitioner must pursue all avenues for relief if he wishes to preserve his claims." *Id.*

There is nothing remotely similar in the present case. Idaho's post-conviction statute simply allows for inmates to challenge the constitutionality of their death sentences. That provision has been regarded by courts around the country as permitting exactly the kind of claim at issue here. No Idaho law says otherwise. This is therefore not a situation in which a general prohibition logically covers a specific claim, rendering *Bargas* inapposite.

The State's reliance on Idaho Code § 19-2719(5) is equally unfounded. Section 19-2719(5) provides that "[a] successive post-conviction pleading" in a capital case must "cast doubt on the reliability of the conviction or sentence." The Idaho Supreme Court has never divined from § 19-2719(5) a blanket prohibition on claims that relate to the execution rather than to events that transpired at the original sentencing proceedings. As such, § 19-2719(5) has not been followed in the way the State needs "in the vast majority of cases," *Moran v. McDaniel*, 80 F.3d 1261, 1270 (9th Cir. 1996), and it is not adequate to preclude federal review.

The Idaho Supreme Court has historically taken § 19-2719(5) as going to the strength of a petitioner's evidence rather than the cognizability of his claim. *See Row v. State*, 177 P.3d 382, 383–84 (Idaho 2008) (deeming *Brady*[5] evidence to be

---

[5] *Brady v. Maryland*, 373 U.S. 83 (1963).

immaterial and insignificant and thus not reasonably probable to have affected the outcome had it been disclosed); *Sivak v. State*, 8 P.3d 636, 643 (Idaho 2000) (rejecting a post-conviction claim based on the alleged suppression of evidence because the underlying facts were known to the defense and thus could not have undermined the reliability of the outcome). Idaho's "reliability" provision is ultimately a prejudice test to determine whether the claim, if true, is consequential enough to unsettle the final result. Mr. Creech's claim is not categorically precluded by the statute under this established framework because, as per his theory, the death sentence could never be carried out without violating his constitutional rights. At a minimum, at the time Mr. Creech filed his post-conviction petition there was no Idaho law to the contrary, and any resulting default is inadequate.[6]

Lastly, it is telling that while it rejects a post-conviction petition as the proper avenue for Mr. Creech's claim, the State offers no alternative. In its brief statement on exhaustion, the State seems to go so far as to affirmatively aver that no vehicle exists for the claim in Idaho's courts. *See* Dkt. 16 at 6. But if that is true, then federal merits review is even more inevitable. "[I]f a state procedural rule frustrates the exercise of a federal right, that rule is inadequate to preclude federal courts from reviewing the merits of the federal claim." *Hoffman v. Arave*, 236 F.3d

---

[6] Without elaboration, the State appears to suggest that Mr. Creech's briefing in the Idaho Supreme Court on the cognizability question was inadequate. *See* Dkt. 16 at 8. That is incorrect. Mr. Creech thoroughly presented his position on cognizability at the Idaho Supreme Court. *See* Dkt. 15, Lodging B-6 at 11–14; B-8 at 3–7. Furthermore, as noted above, it is the State's burden to prove that a default is adequate. For federal habeas purposes, Mr. Creech's obligation is to respond to the State's default argument, which is what he appropriately does here.

REPLY IN SUPPORT OF HABEAS PETITION AND STAY OF EXECUTION - 8

523, 531 (9th Cir. 2001). Under the State's view, Mr. Creech has no state mechanism for vindicating his claim that it would be unconstitutional to attempt to execute him by any method. As such, state procedural rules would obstruct Mr. Creech's access to the courts on his Eighth Amendment theory, rendering the bar inadequate.

When the state courts impose a procedural bar that is unenforceable in federal habeas, the claim is reviewed de novo and without the deference that would otherwise be demanded by the Antiterrorism and Effective Death Penalty Act (AEDPA). *See Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc). In that circumstance, the state courts have also not resolved the claim on the merits. The federal habeas analysis is then not limited to the record assembled in state court. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court *that adjudicated the claim on the merits*"). Consequently, if Mr. Creech's Eighth Amendment claim is defaulted by the Idaho Supreme Court, the arguments set forth below and in Mr. Creech's stay application, *see* Dkt. 10, should be reviewed de novo and any new facts supporting them are permissible.

**B.     The Eighth Amendment claim is meritorious.**

Turning to the merits, Mr. Creech will first refute the State's assumption that psychological pain is irrelevant under the Eighth Amendment. Then, he will explain how the state actors involved in his second execution attempt have the mental state required to substantiate his claim. And finally, Mr. Creech will show

how other states have until now uniformly and deliberately abandoned second lethal-injection attempts, putting Idaho in a league of its own in terms of its cruelty.

### 1.  Psychological pain can be unconstitutional.

The State takes great pains to minimize if not outright dismiss the psychological trauma that Mr. Creech endured during the State's botched execution attempt and the continued impact that trauma has had on Mr. Creech's daily existence. *See* Dkt. 16 at 18 (describing the botched execution as "mild discomfort"). The State also brushes aside the profound impacts of re-traumatization on Mr. Creech due the State's intent to attempt to execute him a second time. *See id.* at 27–28 ("his concerns about the upcoming execution . . . pale in comparison . . .").

The unnecessary and wanton infliction of pain upon prisoners constitutes cruel and unusual punishment forbidden by the Eighth Amendment. *Whitley v. Albers,* 475 U.S. 312, 319 (1986). It is legally incorrect for the State to imply that only physical pain matters for Eighth Amendment purposes. To be clear, the infliction of trauma and psychological pain by the State can violate the Eighth Amendment as certainly as the infliction of physical pain. See *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012) (the "alleged pain may be physical or psychological"); *Calhoun v. Detella*, 319 F.3d 936, 939 (7th Cir. 2003) (the wanton infliction of psychological pain is also prohibited); *cf. Capps v. Atiyeh*, 559 F. Supp. 894, 916 (D. Ore. 1983) (an inmate suffers pain under the Eighth Amendment whenever he must endure "untreated serious mental illness for any appreciable length of time").

For example, in *Jordan v. Gardner*, 986 F.2d 1521, 1526 (9th Cir. 1993), a case involving random, non-emergency searches by male correctional officers on female prisoners, the court determined that it was the psychological "revictimization" of the prisoners that violated the Eighth Amendment. While searches in prison are commonplace and necessary to the security and administration of the prison, taking these uniquely situated prisoners, and considering how they had been subjected to experiences similar to past psychological trauma that they had endured, the court found that "the Eighth Amendment prohibition against the unnecessary and wanton infliction of pain forbids these searches under the circumstances of this case." *Id.* at 1524. As in *Jordan*, Mr. Creech is being revictimized daily as he is subjected to the same drawn-out death he was forced to live through in February.

That is also why the State misses the mark in emphasizing that "the allegations upon which Creech bases his fears are inherent in every execution." Dkt. 16 at 30. What is uniquely—indeed, unprecedently—traumatizing in Mr. Creech's case is the very fact that he survived the first lethal-injection attempt and now faces another. The State cannot address that trauma by simply ignoring it. What Mr. Creech is alleging here is that the botched attempt to execute him caused trauma, specifically post-traumatic stress disorder, *see generally* Declaration of Dr. Sondra Crosby, attached as Exhibit 1,[7] that he has lived with ever since, that that trauma

---

[7] Elsewhere in this reply, Mr. Creech has explained why the Court's analysis is not limited to the record assembled in the state post-conviction action. *See supra* at Part

has been exacerbated by the continuing actions of the State, and that it would be cruel and unusual to now carry out his execution given the psychological pain and trauma which is specific to Mr. Creech and specific to his circumstances.

Again, the State attempts to whitewash the extraordinary events of February 28th, 2024, by calling what Mr. Creech endured "mild discomfort." *See* Dkt. 16 at 18. This is a horrifying simplification of the psychological torment of surviving your own attempted execution, to say nothing of the events that followed.

On January 30, 2024, Mr. Creech was taken from his cell on death row, *see* Lodging A-1 at 63, where he had resided for nearly four decades. He was placed in a solitary observation cell that is mere feet from the execution chamber. *See id.* at 133. Both this cell and the chamber are in a building that is separate from the rest of the prison, and in which no other inmate resides. *See id.* at 63. Occasionally Mr. Creech would be removed from this cell to the medical wing of the prison in order for staff to practice his execution, *see id.* at 126, a process he would dwell on as he sat idle in the medical unit. Finally, over the two days prior to his execution, Mr. Creech said his goodbyes to his friends and family, members of his legal team at the Federal Defenders and the State Appellate Public Defender, and staff members at IDOC to whom he had become close. *See id.* at 60–61.

On the day of his attempted execution, Mr. Creech was strapped to a gurney and brought into the execution chamber with the grandeur of a military escort. *See*

---

I.A. For the same reasons, the Court is permitted to consider the new exhibits referenced here.

*id.* at 69. Over the next hour he would be pierced repeatedly by executioners, every inch of their faces covered by masks and eyes obscured by plastic goggles. *See also id.* at 70–74. He was pierced repeatedly in the wrists, the forearm, and the ankles. *See id.* While there were eight attempts to set an IV line, there were more piercings than that as the executioners struggled to find a usable vein. *See id.* At first, the lead executioner spoke in a measured tone, announcing each step that was being taken, that they were swabbing the area with alcohol, that they were applying a numbing agent, that they were agitating the skin, that they were cleaning the area again with alcohol, and so forth. *See id.* After the fifth IV attempt, the executioners stopped talking. *Id.*

As Mr. Creech was lying on the table, with each attempt he thought his death was about to begin and he felt as if he could "taste" the drugs. *Id.* at 63. The absence of his spiritual advisor terrified him because Mr. Creech thought that he was supposed to be there when the drugs were injected. *Id.* All the while, Mr. Creech stared into the anguished face of his wife, his head directly in line from where she was seated just feet away, a trauma he can't bear to face again. *Id.*; *see also id.* at 65–66, 69. After eight attempts, the executioners consulted with the Warden and the Director, and the execution attempt stopped. *Id.* at 74.

Now Mr. Creech suffers from Post Traumatic Stress Disorder, "PTSD," the clinical diagnosis for when an individual has suffered from trauma so extreme that it impacts their mental and physical health. Dr. Sondra Crosby is an expert in the diagnosis and medical care of victims of torture, who has worked alongside former

United Nations Rapporteurs on Torture and Cruel, Inhuman, and Degrading Treatment in updating the international protocol (the Istanbul Protocol) for the documentation of torture. *See* Ex. 1 at 1–2. According to her, Mr. Creech meets the formal diagnosis for PTSD with dissociative features and major depression. *See id.* at 3. She notes that Mr. Creech's mental health and PTSD have been severely exacerbated by the psychological trauma he has suffered following "the failed execution attempt . . . [and again with t]he issuance of a new death warrant . . ." *Id.*

A diagnosis of PTSD is made when an individual is exposed "to actual or threatened death, serious injury, or sexual violence . . .  [by] directly experiencing traumatic evidence," and there is the presence of "one of more intrusion symptoms associated with the traumatic event, beginning after the traumatic event occurred". The Diagnostic and Statistical Manual of Mental Disorders [DMS-V-TR], American Psychiatric Association (5th Ed. Revised 2022) at 301. Intrusion symptoms include recurrent, involuntary and intrusive memories; dissociative reactions; intense or prolonged psychological distress at exposure to triggers that symbolize an aspect of the traumatic event; and marked physiological reactions to triggers that symbolize an aspect of the traumatic event. *Id.* at 301–02.

Mr. Creech currently exhibits a plethora of intrusion and related symptoms, including but not limited to:

- Flashbacks of being strapped to the execution table, which cause abject fear and panic. Ex. 1 at 10.

- Being triggered by sounds of the metal cell doors clinking, which causes intense fear that the executioners are coming to get him, as well as being triggered by the smells of welding and the sound of construction in the

execution chamber, which causes terror that the State is going to attempt a
different method of execution this time, possibly electrocution. *Id.* at 10.
These triggers are both accompanied by a rapid heart rate, sweating, nausea,
severe headaches and confusion. *Id.* at 11.

- Vivid nightmares of increased intensity since February, including nightmares
  that involve the executioners taking off their masks to reveal that they are
  members of his trusted legal team; nightmares that he is being autopsied
  alive; and nightmares that it is LeAnn ("Le"), his wife of over a quarter-
  century, that is on the execution table and he is powerless to stop her
  execution. *Id.*

- Profound sleep disturbance, only sleeping 2 to 3 hours a night, which has
  worsened since his relocation to the death house. *Id.*

- Dissociative episodes where Mr. Creech loses time, with some episodes
  leading to falls. *Id.* at 12.

- Diminished memory and decreased concentration, including "extreme lapses
  in short term memory[,]" with difficulties understanding "the execution
  process" even though it has been explained to him. *Id.* at 13.

- Hallucinations including seeing his brother in a casket in his cell, shadows on
  the wall beckoning him with their hands, his deceased mother on the ceiling
  of his cell, and other executed inmates visiting him in his cell. *Id.* at 14.

- And the constant feeling of being "sick" with guilt about the damage the
  execution process is doing to the people who love him, including his wife Le.
  *See id.* at 12.

The traumatic event at issue for this most recent diagnosis of PTSD is the
execution attempt of February 28th, 2024, but that event is merely the starting
point, not the ending point. "Having someone try to end one's life is one of the most
viscerally terrifying and incapacitating experiences that a human can endure," with
actual physical consequences to the functioning of the brain. *Id.* at 4. For example,
Dr. Crosby notes, persons who have survived an execution attempt or a mock
execution soon learn that "the same neurochemical and neuroendocrine reactions

that may have helped a person survive a life-or-death event will also recur and reappear after the trauma, causing impairment in an individual's biopsychosocial functioning. This reliving of trauma and the accompanying triggering of states of fear and shut-down are the core difficulties faced by those with stress and trauma-related disorders, such as PTSD." *Id.* at 21.

Such visceral trauma, and the PTSD that flows from it, is significant as a mental health disorder because of the devastating outcomes it has for an individual's mental and physical health. Indeed, psychological stress rising to this level is "capable of altering brain chemistry and brain structure[.]" *Id.* at 23. Repeated triggers or sensory memories of a severe trauma like what Mr. Creech experienced on February 28th, through a process known as neuroplasticity,

> activate hormones, including cortisol, which are released into the body. In humans, chronic excretion of cortisol causes atrophy in brain structures associated with memory formation (hippocampus) and concomitant deficits in declarative memory. Enlargement in brain structures involved in fear, threat detection and anxiety (amygdala) occur in chronic stress. The prefrontal cortex (which supports higher executive functions) becomes hyporesponsive in direct proportion to the chronicity and severity of the stressor state imposed.

*Id.* This type of trauma – that of experiencing one's last month before death, only to then experience the destabilizing helplessness and unpredictability of somehow *surviving* – thus can lead to irreversible brain damage. *See id.* at 22–23. And forcibly putting Mr. Creech into a situation precisely mirroring his triggers will only exacerbate that brain damage by forcing him to relive his trauma.

This is because, in Mr. Creech's case in particular, he is "especially vulnerable to the extreme trauma of an execution attempt and repeated threats of

future executions due to his pre-existing psychiatric disorders . . . ". *Id.* at 4. His

suffering is profound:

> The prospect of repeating the execution is terrifying to Mr. Creech. The
> cumulative effects of the trauma suffered by Mr. Creech is extreme. His
> coping mechanisms have been overwhelmed and are insufficient to
> manage the flood of reminders and current terror his is experiencing as
> he faces a repeat of the execution experience. Like other survivors of
> near-death experiences and mock executions, Mr. Creech is suffering
> from extreme involuntary re-experiencing symptoms and dissociation,
> with all its associated suffering and distress.

*Id.* In other words, because of his experiences in the execution chamber on

February 28th, the trauma of living under constant threat of a warrant, witnessing

the prison's preparation for his execution, and being subjected to the execution

process once more has exponentially amplified his PTSD symptoms.

This trauma that the State is inflicting on Mr. Creech is torture. The State's

quest to try to execute him a second time, and his experiencing the execution

preparation and process again, "will continue to ignite his already severe PTSD

symptoms, catapulting him into states of disabling panic, flight or fight, and

dissociation that can only be characterized as devasting to the human mind and

body." *Id.* at 4–5. The severity of the pain and suffering that Mr. Creech is being

subjected to amounts to torture and "is in violation of the 1984 Convention Against

Torture, Article 1 and Article 16." *Id.* at 5.

Mr. Creech's PTSD was even more profoundly and recently impacted by the

inexplicable and inhumane actions of staff at IMSI. On October 29th, 2024, without

any advance warning, Mr. Creech was removed from his temporary housing in the

medical unit, where he is housed when staff at the prison are "practicing" for his

execution, and taken to a small room down the hall from his cell in the death house. Ex. 2 at 1; Ex. 3 at 1. Two individuals, dressed exactly like the individuals on the execution team, including wearing head and facial coverings, told Mr. Creech to strip down and put on the same scrubs he wore to the botched execution. *Id*. Then, without any explanation to Mr. Creech, they told him to climb up on a small table and began to prod his veins and chat about large needles. *Id*.

This situation was exactly like his flashbacks, Ex. 1 at 10, and was precisely the kind of scenario that feeds his hypervigilance, *see id.*at 12. And so, horrified, Mr. Creech began to panic that this was his execution, moved up two weeks for reasons passing his understanding. Ex. 2 at 1. His paranoia and difficulty trusting others, including his lawyers, Ex. 1 at 13, may have led him to wonder if his legal team had lied to him about his execution date. Or he may have been terrified, given the content of some of his nightmares, that at any moment the people talking about stabbing him might start cutting him open instead, and laughing while they did it. *See id.* at 11.

It is inconceivable that prison staff, who had been observing the manifestations of Mr. Creech's trauma for eight months,[8] could not be aware of the profound trauma that this unexplained event would inflict on him. It is a vivid demonstration, should one be needed, that *any* future execution attempt will result

---

[8] *See, e.g.*, Ex. 1 at 10–11 (just the sound of the guards' keys caused Mr. Creech "intense fear[,]" which in turn would at times manifest as "physiological [symptoms like] rapid heart rate and sweating, nausea, severe headaches and confusion."); *see also infra* at Part I.B.2.

in severe psychological pain. That trauma registers on the Eighth Amendment scale and stacks up against any of the relevant authorities, notwithstanding the State's desire to pretend that there is no such thing as psychological torture.

### 2.  State actors have the requisite mental state.

Fundamentally misunderstanding the nature of Mr. Creech's claim, the State insists that IDOC's executioners had no malicious intent on February 28th, 2024. *See* Dkt. 16 at 18. The State's beliefs about the nature of the failed execution, though incorrect, are more importantly irrelevant. Mr. Creech's claim is not that the State subjected him to cruel and unusual punishment on February 28th, 2024. It is that the State is subjecting him to cruel and unusual punishment *now*, as it hurtles toward a second attempt after botching[9] the first. As clearly articulated in the habeas petition, the claim here is that "[i]t would constitute the unnecessary and wanton infliction of pain on Mr. Creech *to attempt to execute him* by any method *after* subjecting him to the psychological torment of the botched execution on February 28, 2024." Dkt. 1 at 14.

To be sure, there are claims that can be raised by parties challenging unsuccessful executions as themselves cruel and unusual. Most obviously, an

---

[9] The State quarrels with Mr. Creech's use of the term "botched." *See* Dkt. 16 at 17. According to the State, the word is inapt because the execution was not "poorly done." *Id.* It is difficult to fathom how low the State is setting the bar for its agents, since it apparently regards as "well done" an execution in which staff spent an hour stabbing a man with needles in a failed attempt to kill him. Notably, this Court agrees with Mr. Creech on the proper nomenclature. *See Pizzuto v. Tewalt*, No. 1:21-cv-359, 2024 WL 4417419, at *1 (D. Idaho Oct. 4, 2024) (referring to "the botched execution of Mr. Creech"); *id.* at *2 (calling the affair "bungled").

inmate or his estate could file an action under 42 U.S.C. § 1983 demanding damages in compensation for an Eighth Amendment violation that took place during an error-filled execution. *See, e.g.*, *Estate of Lockett v. Fallin*, 841 F.3d 1098, 1105 (10th Cir. 2016) (dismissing a § 1983 lawsuit filed by the family of an inmate seeking damages after the prisoner died during an extended execution "twitching and convulsing on the table," "clenching his teeth and grimacing in pain"). But Mr. Creech did not pursue that course of action. Rather, as noted, he submitted a habeas petition attacking his death sentence as unconstitutional on the ground that it would be cruel and unusual for the State to implement it in a *subsequent* execution attempt. *See* Dkt. 1 at 14.

With that in mind, the State's confidence in the innocence of its executioners on February 28th is neither here nor there. To the extent any intent matters now, it is the intent of the state actors who are preparing to put Mr. Creech to death on November 13th. The question, to put a finer point on it, is whether state officials are acting with "deliberate indifference" to the "serious psychological conditions of" Mr. Creech. *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992). That is the test that applies when, as here, a prisoner alleges that state officials are inflicting unconstitutional mental suffering on him in violation of the Eighth Amendment. *See, e.g.*, *Keenan v. Hall*, 83 F.3d 1083, 1089–90 (9th Cir. 1996).

Departing from that well-established jurisprudential path, the State pulls a different mental-state requirement out of a hodgepodge of non-binding cases. Specifically, the State contends that Mr. Creech's burden is to show that Idaho

officials are acting "intentionally or maliciously." Dkt. 16 at 16, 23, 29. To bolster

that test, the State relies on the out-of-circuit case of *Broom v. Shoop*, 963 F.3d 500

(6th Cir. 2020). *Broom*, for its part, attributed the supposed rule to "five justices in"

*State of Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947). *See* 963 F.3d at

512. The first problem for the State is that there is nothing remotely like this

"intentional or malicious" test in *any* of the Justices' *Resweber* opinions. None of the

*Resweber* writings use any form of the word "malicious." *See generally* 329 U.S. 459.

As for intentionality, the concept appears only in Justice Burton's dissent. *See* 329

U.S. at 476–77. That absence of authority cannot codify the State's preferred test

when, in the years since *Resweber*, both the Supreme Court and the Ninth Circuit

have repeatedly affirmed the governing framework—that of deliberate indifference

to serious harm. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) ("A prison

official's deliberate indifference to a substantial risk of serious harm to an inmate

violates the Eighth Amendment."); *accord Disability Rights Mont., Inc. v. Batista*,

930 F.3d 1090, 1097–98 (9th Cir. 2019).

It is natural that the State would seek to distance itself from the controlling

test. It cannot—and does not—assert that the deliberate-indifference standard is

unsatisfied when its agents have entirely through their own actions put Mr. Creech

in a position where he is being tortured every day, for the second time, with the

preparations for his involuntary death, after the same people thoroughly

traumatized him with the first attempt. That is no doubt why the Attorney General

spends his time focusing on what was going through the minds of the executioners

who failed for forty-five minutes on February 28th, rather than what has been going through the minds of prison officials every day since, as they have kept Mr. Creech in an indefinite state of agony for all of that time and have now exponentially increased his trauma by forcing him through the process again.

"Whether a prison official had the requisite knowledge of a substantial risk" can be proven by "the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. The risks to Mr. Creech could not be more obvious. Every state actor associated with Mr. Creech's upcoming execution knows that Idaho tried and failed to kill him on February 28th. Every one of them knows that a man on death row who survived one attempt to kill him is going to live in dread of the next one. Every one of them knows that after spending eight months with that dread, Mr. Creech was again read a document telling him when he would die at the hands of the State, told to make arrangements for his demise, and compelled yet again to talk to his wife of twenty-five-plus years about it. Every one of them knows that Mr. Creech was taken to live in a cell next to the very place where he was previously strapped to a table and forced to look into his wife's eyes while he expected to be publicly killed before a crowd of dignitaries. Every one of them knows that Mr. Creech is now fully aware that officers are planning on taking him back to that same place to face that same fate. Every one of them knows that Mr. Creech is currently living with daily exposure to the elaborate machinery of his own death, including noisy construction, execution trainings, and so forth.

Apart from that general knowledge, many state actors have a far more intimate understanding of how profound the trauma to Mr. Creech has been. The prison officers who interact with Mr. Creech every day have observed his extreme paranoia since the failed attempt. *See* Lodging A-1 at 64. They have seen his obsession with staring at the death house, and how he cannot stop himself from losing minutes or hours to this morbid fascination. *See id.* at 65. They are aware of Mr. Creech's hallucinations and the intensity of his anxiety. *See id.* at 465–66. They know that Mr. Creech is unsure of whether he is alive or dead. *See id.* at 67. And now those officers are watching Mr. Creech be taken back to the death house for his trauma to be magnified a thousandfold. Under these circumstances, the idea that the State is not deliberately indifferent to a serious risk to Mr. Creech's mental health is fantastical. After all, what person who has lived through an attempt on his life would not be at jeopardy of serious psychological harm by knowing that a second attempt was coming?

But perhaps no clearer example of this deliberate indifference exists than the State's actions on October 29th, 2024 recounted above. The event was so stressful that the next day, just recounting it caused him to have a cardiac event. Ex. 2 at 2. At any time before putting Mr. Creech through this, anyone from the State could have reassured him that he was not facing his execution that night. They could have explained what they were doing before standing over him and talking to each other about what size needles to use on him. Or they simply could not have performed this vein assessment in what is very likely the room in which the State

will once again try to insert IV lines into Mr. Creech's body to try to kill him. But they didn't. They didn't think about Mr. Creech's obvious signs of trauma or how he might psychologically and physiologically respond to this event at all. They just heedlessly put him through it. The State's actions here are the very definition of deliberate indifference.

### 3.   The reasons states do not attempt second executions

In the State's counterintuitive opinion, it is not "unusual" under the Eighth Amendment that Idaho is about to become the first jurisdiction in the country in the modern era of the death penalty to attempt the same method a second time after failing the first. *See* Dkt. 16 at 30–31. Preliminarily, the State is unequivocally wrong in suggesting that Idaho is actually using a different method now, since it is pivoting to the central line. *See id.* at 30. For one thing, the current protocol still calls for a peripheral-IV attempt at the outset, just as it did before. *See* Idaho Department of Correction Execution Chemicals Preparation and Administration form at https://forms-idoc.idaho.gov/WebLink/DocView.aspx?dbid=0&id=982043&page=1. More importantly, the State misunderstands what a method of execution is. Idaho's statute helpfully answers this question of terminology: "the method of execution shall be *lethal injection*." Idaho Code § 19-2716. No authority that Mr. Creech is aware of has ever referred to peripheral IV or central lines as a method. They all, like Idaho's statute, consider the method to be lethal injection. *See, e.g.*, *Baze v. Rees*, 553 U.S. 35, 42 (2008) (plurality op.) (discussing a bill "proposing lethal

injection as the State's method of execution"). Lethal injections are the relevant category. And in seeking a second lethal injection, Idaho is in a class of one. That is as unusual as it gets.

In an equally implausible tack, the State seems to suggest that when other jurisdictions have declined to do what Idaho is doing here it has perhaps been for reasons other than humaneness. *See* Dkt. 16 at 30-31. The State's citation for that proposition is *Owens v. Stirling*, 904 S.E.2d 580 (S.C. 2024). But the South Carolina Supreme Court was interpreting its own state constitution. *See id.* at 598 ("Therefore, if a method of punishment—or a method of carrying out a form of punishment—has never been used, or has become statistically uncommon, an *article I, section 15 analysis* requires consideration of the reasons for the statistical lack of use."). A different test applies under the Eighth Amendment, the pertinent authority here. And that test does *not* inquire into such reasons when assessing the rarity of a punishment. *See, e.g.*, *Hall v. Florida*, 572 U.S. 701, 716 (2014) (counting jurisdictions in favor of an evolving standard of decency to prohibit a highly specific type of death penalty law when they had abolished the punishment in its entirety without asking why the change had been made).

*Owens* is also distinguishable on its facts. There, the court rejected a challenge to electrocution in part because it concluded that "the reason electrocution became uncommon was that most inmates who had the choice between electrocution or lethal injection chose the latter." *Owens*, 904 S.E.2d at 598. Nothing

remotely comparable could be said about other states showing the forbearance that Idaho lacks and desisting from a second lethal injection attempt.

In Alabama, Kenneth Eugene "Smith spent multiple hours strapped to the gurney and underwent one-to-two hours of attempts to establish both a standard intravenous (IV) line and a central-line IV," after which the prison "terminated the execution." *Smith v. Hamm*, No. 2:22-cv-497, 2023 WL 4353143, at *1 (M.D. Ala. July 5, 2023). Following the debacle, the Commissioner of the Alabama Department of Corrections, "under the unique circumstances of th[e] case," "determined that lethal injection [was] not available as to Plaintiff and [would] not be used in any future execution attempt of Plaintiff." Ex. 4.[10] Likewise, in Alan Eugene Miller's case, the state "attempted to execute" him "by lethal injection" but "terminated its execution efforts because it had problems accessing Miller's veins to administer the lethal injection drugs." *Miller v. Hamm*, 640 F. Supp. 3d 1220, 1226 (M.D. Ala. 2022). Afterwards, Alabama entered into a stipulation whereby it "agree[d] to refrain from any further efforts to execute Mr. Miller *by means of lethal injection*." Ex. 5.  Another Alabama inmate, Doyle Hamm, survived a lethal injection attempt "due to venous access issues." *Miller v. Hamm*, No. 2:22-cv-506, 2022 WL 12029102, at *1 (M.D. Ala. Oct. 20, 2022). "The Alabama attorney general's office" then "agreed not to seek a new execution" for him. Ex. 6.

---

[10] Mr. Creech respectfully asks the Court to take judicial notice of any filings from other cases referenced here. *See* Fed. R. Evid. 201; *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 743 n.6 (9th Cir. 2006).

The sequence of events in Ohio, where the other two lethal-injection survivors were, is less obvious. At a minimum, though, it can be said that they were never faced with a second lethal-injection attempt, or indeed any execution attempt. Ohio tried to execute Romell Broom by lethal injection on September 15, 2009. *See State v. Broom*, 51 N.E.3d 620, 623 (Ohio 2016). Mr. Broom died of natural causes in December 2020. *See* Ex. 7. It was Alva Campbell's turn to survive a lethal-injection attempt on November 15, 2017. *See Broom*, 963 F.3d at 513. Like Mr. Broom, Mr. Campbell passed away of natural causes—his death occurred on March 3, 2018. *See* Ex. 8. From September 16, 2009 until December 2020, Ohio was in a position where it could have sought to execute at least one inmate who had survived a lethal-injection attempt. Lethal injection became "the only method" of execution authorized in Ohio by statute in 2001. *Turner v. Hudson*, No. 2:07-cv-595, 2016 WL 212961, at *9 (S.D. Ohio Jan. 19, 2016). It remains so today. *See* Ohio Rev. Code § 2949.22(A). Between September 16, 2009 and December 2020, Ohio executed twenty-four people. *See* Death Penalty Information Center, Execution Database, available at

https://deathpenaltyinfo.org/database/executions?state=Ohio&federal=No&page=2. Every single one of them was executed by lethal injection. *See id.*

Thus, the bottom line is that Ohio plainly made a determination not to pursue a lethal-injection attempt on either of the two individuals who were similarly situated to Mr. Creech. Alabama made the same choice. Those jurisdictions recognized the cruelty of trying to kill someone with needles, failing,

and then doing so again. Until today, no state had made a different decision. Idaho's contrary path is unprecedented. When an individual is subjected to a punishment unheard of elsewhere, it is cruel and unusual by any measure. *See, e.g.*, *Coker v. Georgia*, 433 U.S. 584, 594 (1977) (striking down a sentence where it was only authorized in a single state).

## C.   The Eighth Amendment claim is not barred by *Teague*.[11]

In its perfunctory appeal to *Teague*, *see* Dkt. 16 at 34–36, the State misappropriates a test uniquely ill-suited to the present context. Because the State is moving to dismiss the habeas petition on *Teague* grounds, it bears the burden of demonstrating the doctrine's applicability. *See Odle v. Calderon*, 884 F. Supp. 1404, 1411 (N.D. Cal. 1995). The State cannot remotely satisfy that burden.

To begin, the essence of *Teague* is that it is implicated by "new rule[s] of *criminal procedure*," *Edwards v. Vannoy*, 593 U.S. 255, 262 (2021), and Mr. Creech's Eighth Amendment claim clearly does not fall into that category. For one thing, the claim does not relate to the criminal proceedings that occurred in Mr. Creech's case in state court, which is a prerequisite to *Teague*. *See Saffle v. Parks*, 494 U.S. 484, 488 (1990) (explaining that *Teague*'s primary purpose is to guarantee "that state courts *conduct criminal proceedings* in accordance with the Constitution as interpreted at the time of the proceedings"). Mr. Creech's Eighth Amendment claim does not attack any action taken by the Idaho state courts at the trial level or in his direct appeal decades ago. Instead, it is entirely about the State's current attempt to

---

[11] *Teague v. Lane*, 489 U.S. 288 (1989).

REPLY IN SUPPORT OF HABEAS PETITION AND STAY OF EXECUTION - 28

execute him. As such, the claim does not assert a criminal theory within the meaning of *Teague*.

Relatedly, the Eighth Amendment claim is not procedural in the sense contemplated by *Teague*. *Teague* is at issue in cases involving "[p]rocedural rules," i.e., those "designed to enhance the accuracy of a conviction or sentence by regulating the *manner of determining* the defendant's culpability." *Montgomery v. Louisiana*, 577 U.S. 190, 201 (2016) (emphasis in original). For example, the rule that a jury, not a judge, must find aggravating circumstances in capital cases was deemed procedural because it concerned the mechanism by which a defendant is sentenced to death. *See Schriro v. Summerlin*, 542 U.S. 348, 353 (2004). Mr. Creech's Eighth Amendment claim is not analogous. It has nothing to do with the process by which he was sentenced to death, and it is therefore not procedural under *Teague*.

Instead of being procedural, Mr. Creech's claim is substantive. A rule is substantive, and thus excluded from *Teague*'s reach, when it "prohibit[s] a certain category of punishment for a class of defendants because of their status." *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 321 (2002). That describes Mr. Creech's theory. He contends that he is categorically immune from execution because of his status as someone the State tried and failed to put to death. His claim is therefore substantive, and falls outside of *Teague*.

Considerations of timing are another important reason why *Teague* is inapplicable here. The point of *Teague* is to allow state post-conviction courts to "apply the constitutional standards that prevailed at the time the original proceedings took place." *Butler v. McKellar*, 494 U.S. 407, 413 (1990). In other words, a state court should not be punished when it upholds a criminal judgment and then the constitutional goalposts move. The classic *Teague* situation arises after the Supreme Court announces a new rule and a state prisoner whose conviction is final attempts to gain the benefit of it. *See, e.g.*, *Beard v. Banks*, 542 U.S. 406, 413 (2004). The classic *Teague* situation and the logic underpinning it are entirely absent from the instant case. There has been no change in the law and the goalposts have not moved on the Idaho courts. The Idaho Supreme Court has not even resolved Mr. Creech's Eighth Amendment claim yet. It is being asked to apply the same precedent Mr. Creech is presenting to this Court. There is simply no risk of the Idaho courts being treated unfairly in the way that *Teague* forbids, and the doctrine is consequently of no moment now.

Given how categorically inapposite *Teague* is here, it is unsurprising that the State has no authority whatsoever for the proposition that it applies to a claim like Mr. Creech's. Although they are not plentiful, there is an established line of cases in which challenges to executions have been heard in habeas—because they go to any method—rather than in civil rights actions. *See, e.g.*, *Adams*, 644 F.3d at 483. Of those cases, Mr. Creech is not aware of any in which courts have dismissed the execution claim with reference to *Teague. See, e.g.*, *Adams v. Bradshaw*, 484 F.

Supp. 2d 753, 795–96 (N.D. Ohio 2007) (addressing a challenge to lethal injection in habeas on the merits rather than finding it *Teague*-barred). The State's failure to identify a single case in which a challenge to an execution was denied under *Teague* confirms that Mr. Creech's points above are correct. That is enough to show that the State has fallen short of its burden, making dismissal on *Teague* grounds inappropriate.

Finally, even if the State's view of *Teague* were correct—which it isn't—its application of the doctrine is off-base. In applying *Teague*, the State repurposes its AEDPA argument about clearly established Supreme Court law. *See* Dkt. 16 at 36. But "the AEDPA and *Teague* inquiries are distinct." *Greene v. Fisher*, 565 U.S. 34, 39 (2011). As one of the State's own cited cases establishes, a *Teague* analysis—unlike an AEDPA one—does *not* call for clearly established Supreme Court precedent. *See Leavitt v. Arave*, 383 F.3d 809, 819 (9th Cir. 2004) (per curiam). In that way, as well as in the several others outlined above, the State's *Teague* argument falls short of the mark and provides no basis for dismissing the petition, especially at this nascent stage.

## II.    Reply in Support of a Stay of Execution

Mr. Creech turns now to his requested stay of execution pending the Court's resolution of his habeas petition. Regardless of whether the Court views a stay as necessary in order to afford it the time needed to thoughtfully and fulsomely decide the petition or whether it considers Mr. Creech to have raised substantial enough grounds upon which relief might be granted, a stay of execution is warranted.

REPLY IN SUPPORT OF HABEAS PETITION AND STAY OF EXECUTION - 31

### A.   A stay is warranted because this is a first petition.

Though the State rightly accepts that Mr. Creech's is for all intents and purposes a first-in-time habeas petition, in its Response it cites *McFarland v. Scott*, 512 U.S. 849 (1994), only for the proposition that this Court has the "power to stay" Mr. Creech's execution, not that it is obliged to do so. Dkt. 16 at 37 (citing *McFarland*, 512 U.S. at 857). The State should have read a bit further. As the Application for Stay points out, Dkt. 10 at 2, *McFarland* also makes clear that "approving the execution of a defendant before his [first federal habeas petition] is decided on the merits would clearly be improper." 512 U.S. at 858. The State can point to no law to the contrary. That is because there is none.

Expanding upon *McFarland*'s principles, the Supreme Court held in *Lonchar v. Thomas*, 517 U.S. 314, 320 (1996), that "[i]f the district court cannot dismiss the petition on the merits before the scheduled execution, it is *obligated* to address the merits and must issue a stay to prevent the case from becoming moot." Elaborating, the *Lonchar* Court instructed district courts that they may only summarily dismiss a first petition when it "*plainly* appears from the face of the petition . . . that the petitioner is not entitled to relief in the district court," and that although it may expedite review on the merits for petitions which pass that low bar, it may only do so "within the constraints of due process[.]" *Id.* Where a first petition's claims appear substantial enough to survive summary dismissal, the petitioner *cannot* "be denied a stay . . . ." *Id.* at 321.

The Ninth Circuit has likewise emphasized that where a first-time habeas petitioner "has never had a federal court rule on his constitutional claims [. . . , i]t would be inappropriate for us to prevent that consideration merely to accommodate the State's desire for a quick execution." *Calderon v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 163 F.3d 530, 536 (9th Cir. 1998), *abrogated on other grounds by Woodford v. Garceau*, 538 U.S. 202 (2003). "Given . . . the irreversible consequences that flow from the rejection of a capital habeas petitioner's first petition," *id.* at 535, the same principle must hold for a condemned petitioner whose petition is not his first-in-time, but who raises constitutional claims that "could not have been known earlier[,]" Dkt. 16 at 37. To that end, the Ninth Circuit in *Calderon* found a stay of execution "inevitable" where the petitioner's "presentation of [a] *Ford* claim to the district court [was a first petition[ ]" and the claim was not time-barred under AEDPA. 163 F.3d at 536. In such circumstances, the petitioner "is therefore entitled to a stay. . . . [T]he prejudice [stemming from a delayed execution] that the State seeks to avoid cannot be avoided. A delay in [petitioner's] execution is inevitable." *Id.*

As discussed above, *see supra* at Part I, it is far from "plainly" apparent from the face of the Petition that Mr. Creech is not entitled to relief. The Court therefore is obligated to address the merits. That in itself counsels a stay, so as to prevent the case from being mooted by Mr. Creech's execution. *See Lonchar*, 517 U.S. at 320.

Moreover, as the State's lengthy engagement with the merits itself demonstrates, *see* Dkt. 16 at 17–31, Mr. Creech – who has never had a federal court

consider the constitutional errors arising from the State's attempt to execute him a second time – has presented a Petition upon which reasonable minds can differ. *See also infra* at Part II.B. He contended in his Application for Stay, and continues to maintain here, that he has presented substantial grounds upon which relief can be granted on the merits. But at the very least, his Petition presents reasonable and complex questions of both law and fact. And he maintains, contrary to the State's representation, *see id.* at 37–38, that these questions cannot be decided in the last ten days of his life in a manner consistent with due process. In these circumstances, the Court should afford itself the time and space to thoughtfully decide the issues on the merits rather than be forced into error by the State's exigency.

Indeed, this is the tack taken by this Court in its most recent stay-of-execution litigation, in *Pizzuto v. Richardson*, No. 1:22-cv-452 (D. Idaho). Despite being faced with only a single-claim petition, the Court – which, as here, had been presented with extensive stay litigation – found itself "unable to fully consider and adjudicate the petition before the scheduled execution[.]" *Id.* at Dkt. 19. It therefore granted a stay of execution to allow itself the time to carefully and thoughtfully decide the petition – which, notably, it ultimately denied. *Id.* at Dkt. 39.

Because Mr. Creech is entitled to careful resolution of his first-in-time-equivalent habeas petition by this Court, and because the issues he raises deserve more than a handful of days' thought, he is entitled to a stay of execution. He therefore respectfully requests that the Court grant one.

**B.      There are grounds for a stay.**

Yet even if the Court disagrees that Mr. Creech is *entitled* to a stay, he still has raised substantial enough grounds upon which relief might be granted to render denial of a stay inappropriate. One easy way to see as much is to consider Justice O'Neill's dissent from the Ohio Supreme Court's decision in the *Broom* multiple-execution case. Justice O'Neill framed the question as whether "a second execution attempt would constitute cruel and unusual punishment." *Broom*, 51 N.E.3d at 638 (O'Neill, J., dissenting). "Clearly," he answered, "it would." *Id.* (O'Neill, J., dissenting). As he explained, in *Resweber* "five of the justices were able to recognize the second attempt for what it was: torture." *Id.* at 641 (O'Neill, J., dissenting); *see also* Ex. 1 at 4–5.

To the extent that Mr. Creech is not entitled to a stay on the basis that his is effectively a first habeas petition, the test that would apply is whether the questions he has raised are "debatable among jurists of reason." *Vargas v. Lambert*, 159 F.3d 1161, 1166 (9th Cir. 1998). Here, there is no need to puzzle over whether the standard is satisfied because we have proof that it is. Justice O'Neill, surely a jurist of reason, *has* debated the proposition. He regarded a second execution after a failed lethal injection as cruel and unusual under the Eighth Amendment. The controlling test is by definition met.

The point is demonstrated by caselaw regarding certificates of appealability (COAs). COAs are, like successive stays, triggered by a showing that the result is "debatable among jurists of reason." *Miller-El v. Cockrell*, 537 U.S. 322, 330 (2003).

REPLY IN SUPPORT OF HABEAS PETITION AND STAY OF EXECUTION - 35

Many federal judicial decisions have recognized that COAs are appropriate when state judges disagree on the matter. *See Rhoades v. Davis*, 852 F.3d 422, 429 (5th Cir. 2017) ("When a state appellate court is divided on the merits of the constitutional question, issuance of a certificate of appealability should ordinarily be routine."); *accord Jones v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011); *Fransworth v. Boe*, No. 3:20-cv-5067, 2022 WL 4598085, at *8 (W.D. Wash. Sept. 30, 2022); *Menzies v. Crowther*, No. 03-cv-0902, 2019 WL 181359, at *74 (D. Utah Jan. 11, 2019). Just as a COA should always issue when there is a state-court dissent, so too should a stay. Justice O'Neill's dissent in *Broom* therefore confirms the need for a stay here.

The foregoing argument is also sufficient to justify a stay in the event the Idaho Supreme Court rejects his Eighth Amendment claim on the merits. For one thing, in that event, an evidentiary hearing would still be necessary for the reasons Mr. Creech outlined in his moving papers pursuant to § 2254(d)(2) and § 2254(e), which relate to unreasonable fact-finding in state court. *See* Dkt. 10 at 15–21. And for another, even if this Court does examine the case through the lens of § 2254(d)(1) and the question of clearly established federal law, it would still not foreclose the propriety of a stay. Mr. Creech has already explained why the clearly established federal law in question is not embodied by *Resweber*, *see* Dkt. 10 at 21–26, a perspective buttressed by Justice O'Neill's dissent in *Broom*. Once *Resweber* is out of the picture, and assuming that § 2254(d)(1) is the applicable frame of reference, the question becomes what the source of federal law is. Mr. Creech

submits that it is the long-established idea that the Eighth Amendment forbids punishments that "involve torture or a lingering death," *In re Kemmler*, 136 U.S. 436, 447 (1890), or that subject a prisoner to "the unnecessary and wanton infliction of pain," *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Strapping a man down to be publicly killed in front of his beloved wife, failing, and trying to do the exact same thing again with the same method a few months later cannot plausibly be characterized as anything other than torture under this body of Supreme Court caselaw. *See Broom*, 51 N.E.3d at 641 (O'Neill, J., dissenting) ("I believe as a moral and constitutional matter that subjecting Broom to a second execution attempt after even one extremely painful and unsuccessful attempt is precisely the sort of 'lingering death' that the United States Supreme Court recognized as cruel within the meaning of the Eighth Amendment 125 years ago" in *Kemmler*). Again at a minimum, any potential § 2254(d)(1) obstacle does not rule out a *stay*, since reasonable jurists can plainly disagree about whether the Supreme Court's torture cases apply here, as exemplified by Justice O'Neill's dissent in *Broom*.

Finally, the practicalities of the present case militate strongly in favor of a stay. As the State acknowledges, Mr. Creech "has acted with great diligence and speed" in advancing his Eighth Amendment claim. Dkt. 16 at 41. Nevertheless, the death warrant improvidently obtained by the State has created a situation in which a full and fair adjudication of his claim in federal court is impossible. Because of the death warrant, this Court reasonably ordered the parties to submit stay briefing that would be completed on today's date. *See* Dkt. 14 at 2. With the instant

submission, the stay briefing is technically ripe for decision. Yet the Idaho Supreme Court has not yet ruled on the pending state appeal, even though it vacated oral argument more than a week ago. *See* Lodging B-5 at 3. That dynamic has put the parties and this Court in an untenable position. As demonstrated by the stay briefing from both parties, the Idaho Supreme Court opinion will have a substantial impact on the posture of Mr. Creech's stay application. The parties have had to brief such questions based on an opinion that does not exist. They have both done their best to do so. Nevertheless, the circumstances are a perfect recipe for a decision from this Court that is not grounded in the most comprehensive, focused briefing. The remedy for that unfortunate state of affairs is a short stay, so that the parties have time to adequately brief the Idaho Supreme Court's opinion and this Court has the time to adequately consider the serious and high-stakes claim presented here.

## III.   Conclusion

Without a stay, Mr. Creech will become the first prisoner in American history to face two lethal-injection attempts. He has made a compelling showing that the State is, with every passing day, compounding the already extreme trauma that it has put him through with this grim spectacle. By any fair measure, Mr. Creech has a serious Eighth Amendment claim. It should receive the care and attention it deserves, which cannot happen in the amount of time made available by the State's rush toward death. He therefore respectfully prays that the Court stay his execution.

DATED this 3rd day of November, 2024.

_/s/ Mary E. Spears_
Mary E. Spears
Jonah J. Horwitz

Attorneys for Petitioner

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of November, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

L. LaMont Anderson
lamont.anderson@ag.idaho.gov

_/s/ Heidi Thomas_
Heidi Thomas